**Donald C. SMITH**

v.

**UNIVERSAL SERVICES, INC.**

**Civ. A. No. 68-2099.**

United States District Court,
E. D. Louisiana.

Aug. 9, 1972.

John H. Brooks, LaBorde & Brooks, New Orleans, La., for plaintiff.

J. Barnwell Phelps, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for defendant.

BOYLE, District Judge:

The plaintiff herein, a member of the Pentecostal Church, brought suit against his former employer, Universal Services, Inc. (Universal), for discriminatory employment practices, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Plaintiff alleges that his dismissal from defendant's service was arbitrary and capricious, and solely the result of the plaintiff's religious beliefs and practices.

On February 28, 1967, the plaintiff filed a complaint with the Equal Employment Opportunity Commission, alleging:

> "Because of the ridicule and harassment about my religion by John Darby, Steward, I could not get my work done properly. I was eventually forced to leave my job as utility man on Shell Oil Rig # 11 off Venice, La. I believe I have been discriminated against because of my religion, Pentecostal Church." [1]

Plaintiff received a thirty-day right to sue letter from the EEOC on October 17, 1968, and filed the instant suit on November 15, 1968, through court-appointed counsel.[2]

The plaintiff testified at the trial on the merits that in 1961 he came to Louisiana and joined the Pentecostal Church. Two ministers testified concerning the tenets of this sect relevant to the present dispute. Reverend J. T. Wheat,[3] an ordained Pentecostal minister, testified that it is a practice of his religion to sing hymns under the breath, softly, to use the words "Jesus," and "Amen," and also to discuss the tenets of the religion with others when asked so to do. On cross-examination, Rev. Wheat explained that the Pentecostal Church does not expect a member to sing if this practice would interfere with his work; neither do the tenets require preaching and singing if these practices are prohibited on the job.

1. Exhibit D, complaint.

2. Suit was filed by Helen Harper, Esq. on behalf of the plaintiff. Upon counsel's withdrawal to take a position as an attorney for the Equal Employment Opportunity Commission, the Court appointed John Brooks, Esq. to represent the plaintiff in these proceedings.

3. Plaintiff is a member of a Reverend Morgan's congregation. Rev. Wheat testified that Rev. Morgan had asked him to appear at the trial on his behalf.

Rev. Jones of the Assembly of God testified that the plaintiff, whom he has known for six or eight months, attends his church as well as that of Rev. Morgan. Rev. Jones testified that there is a community of belief between the Assembly of God and the Pentecostal Church, and that he is familiar with the tenets of the Pentecostal Church. Rev. Jones stated that members may sing and use gospel phrases under their breath so long as this practice does not interfere with other persons. Rev. Jones expressed a belief that people should speak of the judgment day, but no one is ordained or qualified to predict the day of the "coming of Christ," but others should be warned of the judgment day.

Against this background, outlining the standards of conduct expected of members of the Pentecostal Church, the Court is presented with the allegation of the plaintiff that he was dismissed by the defendant because of his religion and the contention of the defendant that the plaintiff was terminated because he walked off the job.

The plaintiff's first contact with Universal was on December 9, 1964, when he filled out an application for employment.[4] The plaintiff denied on cross-examination that he had applied for a job with Universal in 1964 or 1965, but, when shown the application, he identified his signature thereon. He stated at that time that he did not remember whether or not he was asked about his religion, but the application form indicates there was no request for information concerning the applicant's religion. On that application, the plaintiff indicated that he had previously applied for a job with Universal "about 6 months ago," but no record of this former application was presented at trial. In the application of December 9, 1964, the plaintiff listed his former employment record as follows:

| Date | Employer | Salary | Reason for Leaving |
|------|----------|--------|--------------------|
| 6/61–3/64 | La. State Rice Mill | $225/mo | Close down. |
| 1/59–2/61 | Airway Motel | $100/mo | Didn't pay enough. |
| 8/57–9/58 | International Export Co. | $250/mo | Close down. |
| 1/55–1/57 | Woodwork Shop | $120/mo | Finished course. |
| 3/53–8/54 | Bricklaying School | $120/mo | Finished course. |

On June 28, 1966, the plaintiff again applied to Universal. On that application,[5] the plaintiff added to his employment record as follows:

| Date | Employer | Salary | Reason for Leaving |
|------|----------|--------|--------------------|
| 4/12/66–5/12/66 | Food & Services | $390/mo | They didn't have anyone to relive (sic) me. |
| 6/11/65–3/27/66 | Boatel, Inc. | $250/mo | Lack of work. |
| 6/12/65–9/21/65 | City of Lake Charles, La. | $240/mo | Wanted to work offshore. |
| 3/1/58–9/12/60 | Airway Motel | $100/mo | Wanted more money. |
| 1/55–7/12/57 | Jones County Jr. College Woodwork | $120/mo | Finished course. |

In August, 1966, plaintiff testified he was hired by Universal. He also testified that he was hired less than ten days after he made his application, although the application signed by the plaintiff indicates that over a month elapsed before he was hired.

Universal assigned the plaintiff to the position of utility man on Shell Oil Company's Rig #11. At some time between

---

4. Exhibit D–10. Universal Services provides offshore food catering and housekeeping service for offshore oil drilling rigs and was under contract to Shell Oil Co. to furnish these services at Rig #11.

5. Exhibit D–11.

the commencement of his employment with Universal and December, 1966, he failed to report promptly for work, and was discharged. Universal rehired him, however, shortly thereafter.

Ernest Runnels, toolpusher for Shell Oil on Rig #11 during 1966, testified that he heard the plaintiff humming or singing songs while at work, but that this didn't bother him. Since the witness was not the plaintiff's supervisor, he was unable to say how well the plaintiff performed his work. At no time in the recollection of the witness did anyone ask the plaintiff to discuss his religion. On cross-examination, Runnels stated he may have complained to the Chief Steward, John Darby, about the food, but he did not think he discussed with Darby that the plaintiff was upsetting his crew. He stated further that one member of his crew had complained about a prediction the plaintiff had made. This crewmember, W. C. Collins, was nervous about riding in the helicopter. According to Runnels, Collins was not usually required to ride in the same helicopter as the plaintiff. The plaintiff later testified that the utility men went in after the other hands in the regular course of the operation.

This witness, who is still employed by Shell, testified that he was not on the rig at all times the plaintiff was, and doesn't recall if he worked on Rig #11 at all during 1967.

Runnels testified further that there was a lot of singing done on the rig, by the plaintiff and by others, and that no complaints concerning the plaintiff's singing were made to him.

J. H. Mouton, the Shell maintenance leaderman offshore during three or four months of Smith's employment on Rig #11, testified that he had observed Smith at work on the rig. Smith sang religious songs and, according to Mouton, was invited to do so. The witness on one occasion played a guitar in his room while the plaintiff sang. The witness was not disturbed by the songs sung and gospel phrases used by the plaintiff and did not know of any other persons who were disturbed. The witness knew of a prediction made by the plaintiff concerning the helicopter, but it did not disturb Mouton or any of his acquaintances. The witness testified that the men sang songs after working hours, but that no singing was done between 5:00 P.M. and 7:00 P.M., during meals. The plaintiff, whom Mouton called "Preacher" because he knew the Bible so well, did not like to hear profanity, and when the men on the rig used profane language, the plaintiff would walk away without making any comment.

James Grant, a Shell derrick hand and roughneck on Rig #11, recalled working with the plaintiff on the rig. He did not know the plaintiff's religion, but testified that the plaintiff seemed very religious, sang and said prayers aloud. These practices did not disturb the witness. The witness was not on the same shift with Tommy Bell, another Shell employee, and his foremen were Runnels and O'Neal.

The plaintiff took the stand in his behalf, affirming his testimony. He testified that he moved to Louisiana in 1961 and worked for three and one-half years at the Louisiana State Rice Mill. He then worked for Food and Services, Inc. for six months, leaving because of lack of work. He began working for the defendant in August of 1966, was discharged for failure to report promptly for work, and was rehired in December, 1966.

He worked as a utility man under John Darby on Shell Rig #11, fourteen days out and seven days in, on a twelve-hour shift. He testified that three weeks after having started work, he was called to the office and told by Darby to "cut out the religious bulls____." He said that Darby called him down seven or eight times before the men because his religious practices were affecting the other men on the rig, and told him that if he didn't stop singing he would be fired, because Darby could "think of a hundred reasons to fire" him.

The plaintiff said that he sang hymns out loud and under his breath, and that he was once invited to sing in a gathering in Mouton's room. He said that he sometimes sang in the galley, and that singing was part of his religion. According to the plaintiff, Darby himself also sang songs in French on many occasions, and Darby was the only one who complained to him about the singing or the religious discussions.

The plaintiff initially testified that he would discuss religion with the men only upon their request. On subsequent examination, he admitted that he would also discuss the religion *sua sponte,* and would continue if no one told him "to shut up."

Darby had warned him that his preaching and singing were affecting the men on the rig and told him to stop, but the plaintiff testified that his religion requires him to spread the gospel.

He admitted having made a prophecy that the helicopter would crash, and everyone would be saved. Darby testified that the plaintiff had prophesied that the helicopter would crash and the plaintiff would be the sole survivor.

Smith stated that his faith requires him to make prophecies when he has a revelation and to discuss his religion with others. During the period from December, 1966 to February, 1967, he preached in the galley and dining rooms whenever he was asked about his religion. The plaintiff testified that the men took his beliefs seriously and let his preaching soak in, although he admitted that they often laughed at him. He testified that everyone called him "Preacher," a name by which the plaintiff said he likes to be called. He talked to the men a few times aboard the helicopter as well as in the galley and dining rooms, about getting right with God. He said that sometimes he would tell them these things although they didn't ask him to preach. He stated that the men knew that if they weren't saved they would be lost and would go to hell.

When asked why it was necessary for him to tell the men they would be lost or for them to ask about it, if they already knew this to be true, the plaintiff had no reply.

The plaintiff's testimony concerning the events leading up to his dismissal was, in several material respects, unclear and contradictory.

The plaintiff swore that he was positive that these events took place in the evening of February 22, 1967; however, the plaintiff's employment records [6] indicate and Darby testified that the date was February 20, 1967. Initially, the plaintiff testified that Darby told him he was tired of Smith's not cleaning up properly. The plaintiff told Darby he couldn't take any more and left the rig. The following day, he went to Evans Thibodaux's office to complain of Darby's harassment. Counsel for the defendant, on cross-examination, questioned the plaintiff concerning his deposition, in which the plaintiff stated at page 9, "Darby kept harassing me and damning me. I just walked off the job . . . because I had to go talk to Mr. Thibodaux." The plaintiff admitted having given this testimony at the deposition. On cross-examination, the plaintiff stated that when he went to see Thibodaux, he thought he still had a job, but Thibodaux told him he was dismissed. Thibodaux allegedly told the plaintiff he did not want to hear anything about his religion. The plaintiff stated further that Darby told him he was fired before he left the rig.

However, if Darby told him he was fired, how could the plaintiff have believed, as he testified, that he still had a job until Thibodaux told him he was fired? When this question was propounded by counsel for the defendant, the witness hesitated for more than a minute and finally admitted he could not answer the question.

The plaintiff then stated that Darby said, "I told you to keep the place clean,

6. Exhibit D-1.

or I'm going to have to let you go." The Court then asked the plaintiff if Darby had, in so many words, told him he was fired, discharged or terminated. After a pause of several minutes' duration, and after counsel for the plaintiff advised the plaintiff to answer the question, the plaintiff said, "Yes. Darby said, 'You're fired.'" However, on two prior occasions Smith had failed to say Darby told him he was fired. On three occasions, as well as in his complaint and pre-trial order, he said he was forced to walk off the job, and on another occasion during cross-examination by counsel for the defendant, he said that when he left the rig he felt he still had a job. Counsel for the plaintiff on redirect examination asked the plaintiff once again to relate the events, and this time the plaintiff gave the following testimony.

Darby told the plaintiff he had to do better work. The plaintiff replied that he had taken all he could take. Darby telephoned to shore for a replacement for Smith. Smith told Darby he would stay on until the new man came. Darby told Smith he was fired.

On recross, the plaintiff stated that Darby did not, on the day of termination, suggest that the plaintiff should stop preaching. Darby allegedly told him he wasn't doing a good enough job cleaning the premises, whereupon Smith said he was leaving to go ashore.

Another inconsistency arises from the plaintiff's testimony concerning the termination of his other employments. On cross-examination, plaintiff denied having voluntarily quit any other employers. However, in his deposition, when asked about his job for six months with Food and Services, he said, "I just quit." His applications for employment with Universal contain contradictory evidence as well. In the 1964 application, he gave as his reason for leaving the Airway Motel, "didn't pay enough." In the 1966 application, the plaintiff reaffirmed this statement ("wanted more money") and gave as his reason for leaving the City of Lake Charles in September, 1965, "wanted to work offshore."

We find that the plaintiff's self-serving statements, which he haphazardly tailored to fit what he considered to be his best interests at the moment, do not lend credibility to his testimony as a whole.

John Darby testified concerning the events culminating in the plaintiff's dismissal. Darby was, in February, 1967, the chief steward for the defendant on Shell Rig #11. He supervised the defendant's employees and bought the necessary supplies for the defendant. Without objection, Darby testified that a rig worker known to him only as "Willy" told him that the plaintiff had predicted a helicopter would fall and the plaintiff would be the sole survivor. Darby testified that the plaintiff had also said he had placed a curse on the rig which would cause the rig to burst into flames and blow up, and, again, the plaintiff would be the sole survivor. Darby also testified that the men on the rig complained to him about the plaintiff's preaching. In addition, one of the toolpushers complained to him that the plaintiff was not cleaning up his quarters properly. Darby stated that he told the plaintiff to stop preaching and singing in the mess hall, but that he had never called the plaintiff a "holy roller" as the plaintiff had alleged.

Darby testified that on February 20, 1967, there had been an argument between the plaintiff and one of the Shell employees. Darby told the plaintiff to leave the Shell men alone. Later, the plaintiff went to the galley and told Darby to fire him. Darby told the plaintiff he didn't want to discharge him since his work had been fairly satisfactory and the witness felt the plaintiff needed his job as much as Darby needed his own. After the meal was served, the plaintiff told Darby he was quitting and went to his quarters to get ready to leave. Darby telephoned to shore for a replacement. Smith returned and asked for something to eat. After Darby fed him, Smith said he'd like to stay on,

whereupon Darby told him he had already called for a relief man. Darby testified that at no time did he tell the plaintiff he was fired.

On cross-examination, Darby testified that he had told the plaintiff on the 19th of February that if he couldn't do his job properly, he would have to leave. He testified further that no one had, in his presence, asked the plaintiff to discuss his religion.

Evans Thibodaux, who was employed by the defendant in February, 1967 as operations manager, then testified concerning the plaintiff's separation. Thibodaux[7] hired the plaintiff on one occasion, and sent his separation notice to the State of Louisiana Division of Employment Security. This notice[8] indicated as the reason for separation that the plaintiff "walked off the job."

The evidence concerning the plaintiff's activities subsequent to his separation from Universal are likewise unclear. After clarification through questioning by the Court and counsel for the plaintiff, it appeared that the plaintiff, in late February, began drawing unemployment compensation. In June, 1967, he went back to work[9] for Food and Services for three months, making $1.60 per hour, working a 12-hour shift, fourteen days on and seven days off. In September he began working for Continental, where he worked for four months on the same schedule for $1.60 per hour. He was laid off, and then went to Edmunson and Dewey Rice Mill where he made $1.45 per hour and averaged at least eight hours per day. He worked there for four months until the rice season was over. After having been without work for a month, he went back to work for the City of Lake Charles for five months at $275 per month. He was discharged for insubordination following his refusal to stop singing gospel songs after his superintendent requested him to be quiet. The plaintiff has not been employed since August, 1968. When he was working for the defendant, he earned $1.60 per hour, and worked a twelve-hour shift, fourteen days on, seven days off. After having worked for Universal for about a month, his salary was raised to $1.75 per hour.

The plaintiff testified that in 1967 Mr. Shaw of Universal told him that Universal would see to it that he would get no more work offshore. However, the plaintiff's own testimony indicates that in 1967 he held two offshore jobs, for Food and Services from June through August, and for Continental from September through December.

Plaintiff's income tax returns[10] indicate that in 1966 he earned $2,528.55, and in 1967 he earned $3,139.80. The plaintiff testified that he filed a return in 1968, but such return, if it exists, was not offered in evidence. The plaintiff stated that 1968 was the last year in which he filed a return. The plaintiff offered no evidence that he was, in fact, employable when he left the service of the City of Lake Charles.

The plaintiff has failed to prove by a preponderance of the evidence that defendant violated the terms of 42 U.S.C. § 2000e–5. The Court finds that the defendant has not intentionally engaged in the unlawful employment practice charged in the complaint.[11]

It is, therefore, the opinion of the Court that judgment should be and the same is hereby rendered in favor of the defendant and against the plaintiff, dismissing plaintiff's suit at his cost.

OPINION ON RECONSIDERATION

Our prior judgment herein having been vacated and this cause remanded

---

7. Thibodaux is now a field supervisor for Boatel, Inc., a competitor of the defendant, Universal.

8. Exhibit D–2.

9. Plaintiff had testified that he drew unemployment compensation for six months, but that figure is not consistent with the subsequent chronology of employment given by the plaintiff.

10. Exhibit P–6.

11. 42 U.S.C. § 2000e–5(g); CCH Employment Practices Guide, ¶ 1261, at 671.

for reconsideration of our judgment after considering the contents of the EEOC investigation report which upon objection we excluded from evidence in the case, Smith v. Universal Services, Inc., 454 F.2d 154 (5 Cir. 1972), counsel for the parties were afforded an opportunity to file additional memoranda, which was done.

After considering the EEOC report, as ordered, and the memoranda of counsel, we are still of the opinion that the defendant is entitled to judgment.

It appears from the Summary of Investigation in the EEOC report that the finding of the Commission was made primarily on the statements of Smith and Darby. The statement of Smith is not in the record, but a transcript of an interview with Darby is. The Summary omits any reference to many statements of Darby included in the transcript (Exhibit P–5). We have no way of knowing whether the investigator's write-up of the interview is all inclusive. We would presume that under the investigative procedures of the EEOC the adverse party does not have the right or opportunity to confront and cross-examine persons being interviewed. Further, there is no indication that persons being interviewed are placed under oath.

On trial Smith testified under affirmation and Darby under oath. Also on trial, Thibodaux, defendant's operations manager, testified under oath. The EEOC report contains no evidence that the investigator interviewed Thibodaux.

On trial Smith, Darby and Thibodaux were subjected to cross-examination. The extent and dignity of the investigation by the EEOC certainly cannot be compared with that made in the courtroom. Nor can the assumed "expertise" of the investigator be compared with that of the able counsel for the parties who thoroughly examined all as-the controversy. Nor can the investigator's "expertise" be compared with that of any trial judge in the area of determination of the credibility of witnesses and the weight to be given evidence.

If the EEOC report, as a business record, must be given the dignity of competent and admissible evidence, and we must accept the mandate of our Fifth Circuit Court of Appeals brothers who say it has such dignity, so also must the defendant's notice of separation of plaintiff from their employ required to be given, and in this case given, to the Division of Unemployment Security (Exhibit Defendant 2). The reason for separation shown in the notice is stated: "Walked off the job." This form was completed on February 23, 1967, a time unsuspicious in the circumstances of this case.

The probative value of the EEOC report we find to be of little or no significance when weighed with the other evidence in the case.

For the reasons assigned herein and in our original opinion, a new judgment will be entered herein in favor of the defendant and against the plaintiff dismissing the complaint at plaintiff's cost.